IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

PHYLLIS ROBINSON,                :
                                 :
        Plaintiff,               :
                                 :
    v.                           :    CIVIL ACTION NO.
                                 :    1:05-CV-1274-JOF
INTERCORP, a division of         :
Nitto Corporation,               :
                                 :
        Defendant.               :

## OPINION AND ORDER

This matter is before the court on Defendant's motion for summary judgment [25], the Report and Recommendation of Magistrate Judge Linda T. Walker [39], and Plaintiff's objections thereto [40].

**I.    Background**

    **A.    Procedural History**

On May 13, 2005, Plaintiff, Phyllis Robinson, filed suit against Defendant, Intercorp. In her complaint she asserted claims under federal law for (1) intentional failure to promote in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII"), 28 U.S.C. § 1658 ("§ 1658"), and 42 U.S.C. § 1981 ("§ 1981"); (2) intentional retaliation in violation of Title VII; (3) intentional disparate treatment in violation

of Title VII, § 1658, and § 1981/42 U.S.C. § 1983 ("§ 1983"); and (4) intentional racially discriminatory acts in violation of Title VII, § 1658, and § 1981/§ 1983.2 (Compl. ¶¶ 49-60). Plaintiff also raised state law claims for negligent retention and negligent supervision (Compl. ¶¶ 61-66). On January 1, 2006, Plaintiff filed an amended complaint in which she added a third state law cause of action for intentional infliction of emotional distress.

### B. Facts[1]

Plaintiff is an African-American woman who worked for Defendant as a receptionist from October 1999 until she voluntarily resigned on December 6, 2005. Defendant's Statement of Undisputed Material Fact (hereinafter "DSMF"), ¶¶ 7, 32. Mr. Adam Nitschke was the manager at Defendant's Atlanta branch. DSMF, ¶ 2; Deposition of Phyllis Robinson, January 4, 2006 (hereinafter "Pl. Dep.") at 23.

In October 1999, Mr. Nitschke decided to hire Plaintiff through a temporary employment agency to work as a receptionist at the Atlanta branch office. (DSMF, ¶ 7). Plaintiff's duties consisted of answering the telephones, sending and receiving faxes, and assisting with collections and accounts receivables. DSMF, ¶¶ 8, 9. Throughout Plaintiff's employment, Mr. Nitschke supervised Plaintiff. DSMF, ¶ 10. In addition to Mr. Nitschke and Plaintiff, Defendant employed two salespeople, Ms. Lou Garner and Mr. John Henley, and one

---

[1] The court draws its recitation of facts from the Report and Recommendation of Magistrate Judge Walker. The court notes that no party has objected to Magistrate Judge Walker's findings of fact.

2

warehouse worker, Mr. Adrian Mitchell, at the Atlanta branch office. DSMF, ¶ 4; Pl. Dep. at 25. Like Plaintiff, all of the other employees at the Atlanta branch office reported to Mr. Nitschke. Pl. Dep. at 27.

In February 2000, Mr. Nitschke offered Plaintiff the receptionist position on a full-time basis, and, accordingly, Plaintiff became a permanent employee. Pl. Dep. at 21-22. When Plaintiff became a full-time employee, Defendant gave her a copy of the Intercorp Employee Handbook, and Plaintiff signed an acknowledgment form indicating that she had received the handbook. DSMF, ¶ 20; Pl. Dep. at 27-28, Def. Exh. 1, Intercorp Employee Handbook. The Intercorp Employee Handbook includes Defendant's written policies prohibiting discrimination and harassment on the basis of sexual harassment and race discrimination, among other things. DSMF, ¶ 16; Pl. Dep. at 27, Def. Exh. 1, Intercorp Employee Handbook. Under Defendant's harassment policy, a complainant must submit a written complaint to the branch manager or officer of the company as soon as possible after an incident occurs. DSMF, ¶ 17. Defendant also has an Equal Employment Opportunity ("EEO") policy, which states that the Defendant does not illegally discriminate against any employee or applicant for employment because of race, color, or sex, among other things. DSMF, ¶ 18. The EEO policy requires that violations be submitted in writing to the branch manager or officer of the company and should include the names of the individuals involved and of any witnesses. DSMF, ¶ 19. Plaintiff knew that both policies required that any policy violations be submitted to Defendant in writing. DSMF, ¶ 21. Plaintiff also "felt

3

comfortable" speaking to two of Defendant's corporate officers, Ms. Iris Nakachi and Mr. Willard Maxwell, who both worked in California. DSMF, ¶¶ 22-25, Pl. Dep. at 45.

In December 2000, Plaintiff began cleaning the Atlanta branch office. Pl. Dep. at 72. Until June or July 2000, Mr. Nitschke's wife, Ms. Natalie Nitschke, cleaned the Atlanta branch office. Pl. Dep. at 45. Plaintiff describes Ms. Nitschke as "Filipino, kind of dark-skinned, colored, slanted eyes," but she recalls Mr. Nitschke saying she was from Sicily. Pl. Dep. at 126. Mr. Nitschke offered to give Plaintiff extra money because cleaning the office was not part of Plaintiff's job description. Pl. Dep. at 46. Plaintiff agreed to the additional responsibility if Defendant paid her the same amount that had previously been paid to Ms. Nitschke. Pl. Dep. at 46-47. However, Plaintiff told Mr. Nitschke that she would not clean the warehouse, because the warehouse bathroom had nude pictures on the walls. Pl. Dep. at 47, 48. Mr. Nitschke said "that was fine with him." Pl. Dep. at 47. In approximately January 2001, Plaintiff saw an increase of $100.00 to her paychecks. Pl. Dep. at 127, 139.

On or around January 22, 2002, Mr. Henley quit his salesman position. Pl. Dep. at 60, 112. Plaintiff asked Mr. Nitschke if she could apply for the sales position job. Pl. Dep. at 112. Mr. Nitschke told Plaintiff no and that she was doing a good enough job in her current position. Pl. Dep. at 112. Plaintiff testifies that Mr. Nitschke did not advertise the position in the paper. Pl. Dep. at 112. A company with whom Defendant was doing business, Rosco Fasteners, referred Mr. Nitschke to a white female named Jill McKinistry. Pl. Dep. at 113.

4

Plaintiff testifies that Mr. Nitschke called Ms. McKinistry and another white male before hiring Ms. McKinistry for the salesman position about a week later. Pl. Dep. at 112-13.

On or around June 8, 2002, Mr. Nitschke and one of his friends came into the office. Pl. Dep. at 39-40. In Plaintiff's presence, Mr. Nitschke told his friend that Plaintiff "don't look bad at all, although I have never dated a black girl, I sure wouldn't mind screwing one." Pl. Dep. at 40. Plaintiff "laughed it off" and told Mr. Nitschke, "thanks for the compliment" but that she was happily married. Pl. Dep. at 40. Plaintiff states, however, that the comment shocked and offended her because it put "a different color to shame." Pl. Dep. at 40, 41. About one week later, Ms. Nakachi telephoned Plaintiff to wish her a happy birthday, and Plaintiff told her about the comment and about statements Mr. Nitschke made when Plaintiff's friend, Ms. Sharon Pepper, came to the office. Pl. Dep. at 30, 41. Plaintiff testifies that this was the first time she complained. Pl. Dep. at 30.

In January 2003, Plaintiff spoke to Ms. Nakachi about receiving two paychecks to compensate her separately for her receptionist position and her cleaning duties. Pl. Dep. at 84, 87. Ms. Nakachi contacted Mr. Josh Abe, the Company President, and Mr. Abe told Plaintiff to speak to Mr. Nitschke about the issue. Pl. Dep. at 84. When Plaintiff got off the phone, she spoke to Mr. Nitschke about her conversation with Ms. Nakachi and Mr. Abe. Pl. Dep. at 84. Mr. Nitschke yelled at Plaintiff about going over his head, stood within inches of Plaintiff, and hit his hand on the desk and wall. Pl. Dep. at 84-85.

5

In March 2003, Mr. Nitschke began bringing a dog he had inherited upon his father's death to work two or three times a week. Pl. Dep. 87, 89, 90. According to Plaintiff, Mr. Nitschke's dog was a big dog who "was pretty much sick ever since he had arrived in Georgia" from California, and Mr. Nitschke would leave his dog in the reception area with Plaintiff. Pl. Dep. at 90-91. In April 2003, Plaintiff states that Mr. Nitschke's dog defecated in the office, and Mr. Nitschke asked Plaintiff to clean up after the dog. Pl. Dep. at 88. When Plaintiff refused, Mr. Nitschke paid one of his friends to clean up the feces. Pl. Dep. at 88. Plaintiff states, however, that after that incident, she began cleaning up after the dog. Pl. Dep. at 88. This involved vacuuming; cleaning up dog food, hair, and urine; wiping off the dog's slobber from the door or from climbing up on stuff; and taking the dog outside to go to the bathroom. Pl. Dep. at 90-91. Plaintiff also states that she twice cleaned up after the dog defecated. Pl. Dep. at 140. In or around September 2003, Plaintiff announced to the office that she would no longer engage in a general office cleaning every two weeks; however, Plaintiff continued to clean up after the dog until it died in November 2003. Pl. Dep. at 91.

On or around November 15 or 17, 2003, Mr. Nitschke told Plaintiff, "[y]ou're getting skinny like I like them" and that "[h]e would like to hit it from the back" while making a sexual gesture in his groin area. Pl. Dep. at 42, 52. A few days later, Plaintiff and Mr. Nitschke got into an argument over a printer jam. Pl. Dep. at 31, 52-53. According to Plaintiff, Mr. Nitschke yelled at her to go home and that he was sick and tired of her. Pl. Dep. at 31-32. Before the day ended, Ms. Nakachi called Plaintiff after hearing from Ms. Garner about Mr.

6

Nitschke's treatment of Plaintiff.  Pl. Dep. at 32.  Ms. Nakachi arranged a conference call later that day between herself, Plaintiff, Mr. Maxwell, and Mr. Abe, during which Plaintiff complained for a second time about Mr. Nitschke.  Pl. Dep. at 30, 32. Plaintiff states that she "pretty much told them everything that was happening at the branch," including the shipping of unpaid merchandise, verbal abuse, sexual harassment, and Mr. Nitschke's comments about herself and female body parts in general.  Pl. Dep. at 32-34, 42, 52.

In January 2004, Plaintiff complained about the fact that Mr. Nitschke had an enlarged image of Janet Jackson's breast on his office computer.  Further she stated that when she saw this image, Mr. Nitschke explained why he did not like Janet Jackson's breasts and what type of breasts he preferred.  Pl. Dep. at 49-50.

In February 2004, Plaintiff voluntarily went on medical leave after her primary physician, Dr. Zavier Ash, diagnosed her with Post Traumatic Stress Syndrome on February 23, 2004.  Pl. Resp., Pl. Exh. 4, Diagnosis Form, February 23, 2004.  Plaintiff voluntarily resigned from Defendant in a letter dated December 6, 2005, which Defendant accepted.  DSMF, ¶ 32; Pl. Dep. at 15.

### C. Report and Recommendation

#### 1. Plaintiff's Sexual Harassment Claim

Magistrate Judge Walker notes in her report that Plaintiff's response to Defendant's motion for summary judgment concedes that she cannot satisfy the legal requirements for her sexual harassment claim and therefore Plaintiff abandons the claim.  The report notes that

7

none of the counts in Plaintiff's complaint specifically references sexual harassment. Even though neither party's brief cites to a particular count or paragraph in the complaint in reference to her sexual harassment claim, Magistrate Judge Walker concludes that Plaintiff brings her sexual harassment claim through her count for disparate treatment. Compl., ¶¶ 55-57. Therefore, Magistrate Judge Walker recommends that Defendant's motion for summary judgment be granted as to Plaintiff's disparate treatment claim.

### 2. Plaintiff's Retaliation Claim

Magistrate Judge Walker's report notes that the basis for Plaintiff's retaliation claim is that Mr. Nitschke retaliated against her, in violation of Title VII, after she complained of sexual harassment, by asking Plaintiff to clean up after his dog. Compl., ¶¶ 44, 45, 52-54.

The report thoroughly addresses the law relating to Title VII retaliation and finds that Plaintiff has failed to make a prime facie case of retaliation.

The report concludes that to establish a prima facie case of retaliation, the plaintiff must show that (1) she engaged in statutorily protected activity; (2) she was subjected to retaliatory action by her employer; and (3) there is a causal connection between the protected activity and the alleged retaliatory action. *See* 42 U.S.C. 2000(e)(3)(a); *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405 (2006); *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006).

The first prong of the retaliation prima facie case requires a showing by the plaintiff that "[s]he has opposed any practice made an unlawful employment practice by this

subchapter" (the opposition clause) or "[s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter" (the participation clause). See *Hudson v. Norfolk S. Ry. Co.*, 209 F. Supp. 2d 1301, 1308 (N.D. Ga. 2001); 42 U.S.C. § 2000e-(3)(a). Under Title VII's opposition clause, a "plaintiff engages in 'statutorily protected activity' when he or she protests an employer's conduct which is actually lawful, so long as he or she demonstrates 'a good faith, reasonable belief that the employer was engaged in unlawful employment practices.'" *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998) (citing *Little v. United Technologies, Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)); *see also Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989). The court measures the objective reasonableness of an employee's belief against existing substantive law and, accordingly, charges the plaintiff with substantive knowledge of the law. *Clover v. Total Sys. Serv.'s, Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999); *Harper*, 139 F.3d at 1388 n. 2.

With regard to the third prong, "[i]n order to establish the requisite 'causal link' required as part of a prima facie case, a plaintiff need only establish that the protected activity and the retaliatory action were not wholly unrelated." *See Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). Close temporal proximity may be sufficient to show that the protected activity and retaliatory actions were not "wholly unrelated." However, when a plaintiff relies on mere temporal proximity to show causation, it must be "very close." *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (finding that a 20-month

disparity was insufficient to establish a causal connection between protected activity and an adverse action, and citing with approval cases holding that a three to four month disparity was insufficient) (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (4-month period insufficient)); *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) (citing *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999)).

Applying the law to the facts of this case, the report finds that Plaintiff fails to articulate a prima facie case for her retaliation claim. Plaintiff arguably references four different instances in which she complained. She states that Mr. Nitschke started bringing his dog to the office and requiring Plaintiff to clean up urine, feces, and saliva left by his dog in retaliation to her comments. Pl. Resp. at 18. First, Plaintiff complained to Ms. Nakachi in May or June 2002 regarding statements made by Mr. Nitschke. Next, in January 2003 Plaintiff talked to Mr. Nitschke about the fact that she was being paid with two different checks as opposed to one paycheck for her services. In November 2003, Plaintiff reported Mr. Nitschke's sexual harassment to company officials. Finally, in January 2004, Plaintiff complained about an enlarged image of Janet Jackson's breast on Mr. Nitschke's computer.

The Magistrate Judge in her report concluded that Plaintiff had failed to show that there was a causal connection between three of these complaints and the alleged retaliatory action. The court found that as Mr. Nitschke began bringing his dog into the office in March 2003 and the dog eventually died in November 2003, this action could not be in retaliation to Plaintiff's

10

comments made in November 2003 and January 2004, as the action occurred before the comments. The court also concluded that a causal connection cannot be supported by temporal proximity, when the comments took place in May or June 2002 and the alleged retaliatory action took place some nine to ten months later.

Finally, the report states that the comments made in January 2003 cannot support a claim for retaliation. While these comments were made within close enough temporal proximity to support a causal connection, the report concluded that these comments do not satisfy the first factor for making a prime facie case of retaliation, namely that she was engaging in a statutorily protected activity when she asked to have two paychecks instead of one.

For all of these reasons, Magistrate Judge Walker recommends that this court grant summary judgment with regard to Plaintiff's retaliation claim.

### 3.   Plaintiff's Intentional Infliction of Emotional Distress Claim

Magistrate Judge Walker's report recommends granting Defendant's motion for summary judgment with regard to Plaintiff's intentional infliction of emotional distress claim.

The report states that to prove a claim of intentional infliction of emotional distress under Georgia law, a plaintiff must show that (1) the defendant's conduct was intentional or reckless, (2) the conduct was extreme and outrageous, (3) there was a casual connection between the wrongful conduct and the emotional distress, and (4) the emotional distress was

severe. *Gaston v. S. Bell Tel. & Tel. Co.*, 674 F. Supp. 347, 352 (N.D. Ga. 1987); *Lockhart v. Marine Mfg. Corp.*, 281 Ga. App. 145, 146-47 (2006). The standard for an intentional infliction of emotional distress claim is very high, and the burden on the plaintiff is "a stringent one." *Ingram v. JIK Realty Co., Inc.*, 199 Ga. App. 335, 336 (1991), *cert. denied*, 199 Ga. App. 906 (1991). A claim for intentional infliction of emotional distress requires more than an allegation that plaintiff was offended or insulted. *Kornegay v. Mundy*, 190 Ga. App. 433, 434, 435 (1989). The conduct must "go beyond all possible bounds of decency, [so as to be] regarded as atrocious, and utterly intolerable in a civilized community." *Jarrard v. United Parcel Serv., Inc.*, 242 Ga. App. 58, 59 (2000). "Such does not include mere insults, indignities, threats, annoyances, petty oppressions, or other vicissitudes of daily living. Plaintiffs are expected to be hardened to a certain amount of rough language and to occasional acts that are definitely inconsiderate and unkind." *Id.* However, the existence of a special relationship between the actor and victim, such as that of employer to employee, may make otherwise non-egregious conduct outrageous. *Trimble v. Circuit City Stores, Inc.*, 220 Ga. App. 498 (1996). By its very nature, the employer-employee relationship provides a captive victim who may fear reprisal for complaining, so that the injury is exacerbated by repetition, and the relationship also presents a hierarchy of structured relationships that cannot easily be avoided. *Id.* at 499-500. Other factors considered by courts include the actor's awareness of a particular susceptibility by the victim and the severity of the resultant harm. *Id.*

12

Nonetheless the report finds that the conduct of Mr. Nitschke was not so egregious to support a claim for intentional infliction of emotional distress. Therefore, Magistrate Judge Walker recommends that this court grant Defendant's motion for summary judgment on Plaintiff's intentional infliction of emotional distress claim.

The report also notes that the parties spent considerable time addressing Plaintiff's claim for *negligent* infliction of emotional distress. Magistrate Judge Walker felt that it was unnecessary to address such a claim as neither Plaintiff's original complaint nor the amended complaint raised such a claim.

### 4. Plaintiff's Negligent Supervision and Negligent Retention Claims

The report finds that Plaintiff's negligent supervision and negligent retention claims also fail to raise an issue of material fact. The report notes that a plaintiff may state a cause of action for negligence against an employer "if the employer, in the exercise of reasonable care, should have known of an employee's reputation for sexual harassment and that it was foreseeable that the employee would engage in sexual harassment of a fellow employee but he was continued in his employment." *H.J. Russell & Co. v. Jones*, 250 Ga. App. 28, 30 (2001). The report goes on to state that a claim for negligent retention or supervision is necessarily derivative and can only survive summary judgment to the extent the underlying substantive claims survive. *Metro. Atlanta Rapid Transit Auth. v. Mosley*, 280 Ga. App. 486, 489 (2006).

13

Here, Plaintiff bases her negligence claims on her assertion that Mr. Nitschke sexually harassed her. Magistrate Judge Walker has already recommended that this court find that Plaintiff has abandoned her sexual harassment claim and that Plaintiff's intentional infliction of emotional distress claim fails as a matter of law. Therefore, she recommends that this court grant Defendant's motion for summary judgment on Plaintiff's negligent supervision and negligent retention claims as they are derivative and cannot survive without the underlying substantive claims.

### 5. Plaintiff's Race Discrimination Claims

First, Plaintiff contends that Defendant has permanently abandoned any defense to the Plaintiff's race discrimination claims. Pltf. Response to Def. Mot for Summary Judgment at 19-20 (citing *Lyes v. City of Riviera Beach, Fla.*, 126 F.3d 1380, 1388 (11th Cir 1997) ("grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned")). Upon analyzing the *Lyes* case, the report found that *Lyes* addresses a different issue from the case at hand, and thus it found that Defendant has not abandoned any defense to Plaintiff's various race discrimination claims.

Magistrate Judge Walker suggests that this court deny Defendant's motion for summary judgment without prejudice as it relates to Plaintiff's race discrimination claim and that Defendant be given leave again to move for summary judgment. The report suggests such action because in its initial motion for summary judgment, Defendant addresses all of Plaintiff's claims relating to race discrimination collectively. Further, in its motion for

14

summary judgment Defendant makes no effort to distill its arguments relating to Plaintiff's claim of failure to promote as opposed to her other race discrimination claims. Defendant tries to correct this error by raising arguments of why Plaintiff's failure to promote claim fails for the first time in its reply brief.

The court recommends denying Defendant's motion to dismiss without prejudice as "arguments raised for the first time in a reply brief are not properly before the court." *Hall v. Coram Healthcare Corp.*, 157 F.3d 1286, 1290 (11th Cir. 1998); *United States v. Martinez*, 83 F.3d 371, 377 n. 6 (11th Cir. 1996), *cert. denied*, 519 U.S. 1133 (1997).

**D.     Contentions**

In response to Magistrate Judge Walker's Report and Recommendation, Plaintiff raises no objections to the report's recommendations regarding her sex discrimination, retaliation or state law claims. Rather, Plaintiff only objects to the treatment of her race discrimination claims. First, she objects to the report's finding that Defendant had not abandoned its defense to Plaintiff's race discrimination claims. Plaintiff claims that the report erred by not taking judicial notice of Defendant's abandonment.

Second, she objects to the report recommending that this court deny Defendant's motion for summary judgment without prejudice as it relates to Plaintiff's race discrimination claim and that Defendant be given leave again to move for summary judgment. She contends that this is an abuse of discretion as it gives Defendant a second chance to move for summary judgment.

15

## II.  Discussion

Having read and considered Magistrate Judge Walker's Report and Recommendation concerning Plaintiff's sex discrimination, retaliation or state law claims and considering the Plaintiff's failure to object to the Report and Recommendation concerning the analysis of these claims, the court ADOPTS the Report and Recommendation as the order of this court insofar as it addresses Plaintiff's sex discrimination, retaliation or state law claims. Thus, the court GRANTS Defendant's motion for summary judgment on Plaintiff's sex discrimination, retaliation or state law claims.

With regard to the Report and Recommendation's treatment of Plaintiff's race discrimination claim, this court finds that Plaintiff's objections are without merit. None of the cases cited by Plaintiff in her objections to the Report and Recommendation stands for the principle that a defendant who does not raise an argument in its motion for summary judgment has abandoned any such position. Specifically, *Lyes* stands for the principle that grounds raised in a claim in the complaint but not relied upon in summary judgment are deemed abandoned.

Here, Defendant did not abandon a claim for summary judgment on Plaintiff's race discrimination claims. Rather, it specifically moved for summary judgment on Defendant's race discrimination claims. Nonetheless, because Defendant did not separate its arguments regarding the different claims of race discrimination and articulate grounds justifying summary judgment as to each claim until its reply brief, the court finds it would be unfair to

16

address any such claims at this time. The court finds that Plaintiff must be afforded an opportunity to respond to Defendant's arguments.

Thus, the court finds merit in Magistrate Judge Walker's recommendation of denying Defendant's motion for summary judgment without prejudice. The court does not find such action to be an abuse of discretion. Summary judgment serves the purpose of ensuring that only instances where there is a genuine issue of material fact go to trial. Such a tool is vital to judicial economy. By forcing Defendant to refile its motion for summary judgment rather than ruling on arguments raised for the first time in the reply brief, the court is requiring Defendant clearly to elucidate its arguments so that Plaintiff is able adequately to respond to Defendant's arguments. Further, such action will promote judicial economy by ensuring that there is a genuine issue of material fact prior to trial.

Therefore, the court accepts the advice of Magistrate Judge Walker. The court DENIES WITHOUT PREJUDICE Defendant's motion for summary judgment with respect to Plaintiff's race discrimination claims and gives Defendant leave again to move for summary judgment. Any such motion should be filed within thirty (30) days of this order.

### III.   Conclusion

The court GRANTS Defendant's motion for summary judgment on Plaintiff's sex discrimination, retaliation or state law claims. The court DENIES WITHOUT PREJUDICE Defendant's motion for summary judgment with respect to Plaintiff's race discrimination

claims and gives Defendant leave again to move for summary judgment. Any such motion should be filed within thirty (30) days of this order.

**IT IS SO ORDERED** this 8th day of March 2007.

                                              s/ J. Owen Forrester
                                              J. OWEN FORRESTER
                                  SENIOR UNITED STATES DISTRICT JUDGE